1   Archie S. Robinson, Esq. [SBN 34789]
    Robert A. Nakamae, Esq. [SBN 148561]
2   Kevin M. Vincent, Esq. [SBN 218278]
    ROBINSON & WOOD, INC.
3   227 North First Street
    San Jose, CA  95113
4   Telephone:     408/298-7120
    Facsimile:     408/298-0477
5
    Attorneys for Defendant and Counter-Claimant
6   R.E. SERVICE CO., INC.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         OAKLAND  DIVISION

11  JOHNSON & JOHNSTON ASSOCIATES,            No. C-03-2549 SBA
    INC., a New Hampshire corporation,
12                                            ***R.E. SERVICE CO., INC.'S***
              Plaintiff/Counter-Claim         ***RESPONSIVE CLAIM***
13            Defendant,                       ***CONSTRUCTION BRIEF***

14  vs.
                                              ***PATENT INFRINGEMENT***
15  R.E. SERVICE CO., INC., a California
    corporation,
16                                            Complaint Filed:  5/29/03
              Defendant/Counter-Claimant.
17  _____/

18

19

20

21

22

23

24

25

26

27

28

# I.

## INTRODUCTION

Defendant and Counter-Claimant R.E. SERVICE CO., INC. (hereafter "RES") respectfully submits this responsive brief on claim construction of JOHNSON & JOHNSTON ASSOCIATES, INC.'s (hereafter "JJA") patents pursuant to Patent L.R. 4-5(b).

# II.

## HISTORY OF LITIGATION BETWEEN THE PARTIES

### A.    The '050 Patent and Prior Litigation

U.S. Patent Nos. 5, 674,596 (the "'596" patent) and 5,942,315 (the "'315" patent) are continuations of U.S. Patent No. 5,153,050 (the "'050 patent") issued to JJA.. (See Exhibits 1,2, and 3 respectively to the Declaration of Kevin M. Vincent[1]).  The '050 patent discloses a laminate for the manufacture of a printed circuit board.  The laminate is constructed of at least one sheet of copper foil and a sheet of aluminum.  The copper foil is the functional element of the printed circuit board in that it provides the needed electrical conductive paths.  The aluminum sheet serves as a substrate during the manufacture of the laminate and is a discardable element.  (Exh. 3, col. 3 lns. 9-21).

The specification discloses that, while aluminum is "currently the preferred material for the substrate, other metals, such as stainless steel or nickel alloys, may be used."  (Exh. 3, col. 5 lns. 5-9).

A "band of flexible adhesive" is disposed between the confronting surfaces of the copper foil and the aluminum sheet (along their edges); bonding the copper foil and aluminum sheets together.  The patent describes that this "band of flexible adhesive" creates and maintains an "uncontaminated central zone" inwardly of the edges of the sheets, and "seals" the uncontaminated central zone before and during the manufacturing process.  (Exh. 3, col. 3 lns. 22-27).

---

[1]All subsequent Exhibits will reference those attached to the same declaration.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

### B.    The '596 and '315 Patents

The '596 and '315 are continuation patents of the '050.  They cover similar related products whose substrates made of metal other than just aluminum.  They also claim additional inventions such as a steel substrate in the '596 patent and islands of flexible adhesive in the '315 patent.

### C.    Prior Litigation

#### 1.    The First Action

The first lawsuit, R.E. Service Co., Inc. v. Johnson & Johnston Associates, Inc., N.D. Calif. No. C92 20672 JW ("First Action"), involved copper-aluminum laminates manufactured by RES under the trademarks "AC2" and "AC3."  These products consisted of copper foil attached to aluminum separator sheets by adhesive.  In 1992, U.S. Patent No. 5,153,050 (the "'050 patent") issued to JJA and JJA notified RES that in its opinion RES was infringing the '050 patent by manufacturing and selling AC2 and AC3.  RES subsequently filed an action for declaratory relief, asserting the '050 patent was invalid because of prior public use and obviousness.  JJA counterclaimed for patent infringement.

The First Action was heard by a jury in June 1994 before Judge Robert P. Aguilar. JJA prevailed on all issues.  The '050 patent was held to be valid, and RES and Mark Frater were found liable for infringement.  (See "Partial Judgment Pursuant to Fed. R. Civ. O. 54(b)", attached as Exhibit 4).  The partial judgment enjoined RES from manufacturing any copper-aluminum laminates with a "band of flexible adhesive which forms a continuous seal joining the uncontaminated surfaces..."  (Exh. 4, ¶ 4).

(a)    The Jury Did Not Find RES' and Mark Frater's Infringement Willful.

JJA's recitation of the facts regarding the history of the First Action is wrong in a number of aspects and demonstrates their unfamiliarity with the facts and procedural

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

history of that case.[2]  First, the final judgment of July 29, 1994 **did not** find that RES

willfully infringed the '050 patent.  (See Exh. 4).

The  Jury answered "no" to the willfulness interrogatories, and that JJA had to make a

motion notwithstanding the judgment in order to overturn the jury's finding of non-

willfulness. (See "Jury Verdict" in First Action, attached as Exhibit 5).

(b)    <u>The First Contempt Order Did Not Involve Gapped
Adhesives</u>.

Again, JJA's recitation of the facts is misleading and simply wrong when it states

that on January 25, 1995 the court "entered a further order finding RES to be in contempt

of the July 29, 1994 injunction for manufacturing a modified AC3 product that had gaps in

the adhesive band."  This is at best a horrible mis-reading of the judgment or at worst a

misrepresentation to this Court.  The January 25, 1995 "Order re Post-Trial Motions"

states on page 51 that "(a)s presently phrased, the injunction prohibits the making and

selling of a specified laminate with a "continuous seal."  (See "Order re Post-Trial

Motions", attached as Exhibit 6).  In the contemporaneously filed "Findings of Fact and

Conclusions of Law" of January 25, 1995, the Court states in the "Findings of Fact" that:

"7.    After the jury verdict was rendered, RES represented that it adopted a
new design for its product.

8.    The new design had numerous short beads of glue with numerous gaps
between the beads around the four edges of the product.

9.    On August 11, Mr. Frater, president of RES, gave samples of the "new"
AC3 to counsel for JJA.

10.    The samples provided on August 11th were made after the injunction
had been entered.

11.    The samples contained numerous gaps between numerous small glue
beads around the perimeter of the product, with the gaps ranging in width
from three-quarters of an inch to two inches.

12.    Pacific Circuits is a manufacturer of printed circuit boards in
Redmond, Washington.  Pacific Circuits has been a customer of RES since
January of 1994.

---

[2]This is understandable because JJA is no longer under the control of the parties that
litigated those claims, i.e. John Johnston as founder and owner of JJA, but instead has been
sold to the other corporations which are additionally listed as plaintiffs to this action.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

13.     On October 4, 1994, RES shipped or caused to be shipped to Pacific Circuits 1,539 pieces of AC3 laminate measuring 23 inches by 28 inches, 1050 pieces of AC3 laminate measuring 20 inches by 26 inches, and 200 pieces of AC2 laminate measuring 23 inches by 28 inches.

14     On October 11, 1994, RES shipped or caused to be shipped to Pacific Circuits 500 pieces of AC3 laminate measuring 20 inches by 26 inches, 500 pieces of AC3 laminate measuring 23 inches by 28 inches, and 200 pieces of AC2 laminate measuring 23 inches by 26 inches.

15.     At the request of JJA, Pacific Circuits selected from inventory a random sampling of 15 pieces of AC3 from the October 4 and October 11 shipments.

16.     On or about October 17, 1994, Pacific Circuits packaged these pieces and sent them to counsel for JJA.  Pacific Circuits did not, in receiving, handling, storing, or selecting these 15 pieces of AC3, modify or change them in any material way.

17.     The pieces provided by Pacific Circuits **had a band of flexible adhesive which formed a continuous seal around all four edges of the aluminum and copper**.

18.     None of the pieces provided by Pacific Circuits were of the so-called new design having numerous gaps and numerous small beads of adhesive around all four edges of the aluminum and copper."  (Emphasis added.)

Later, in the "Conclusions of Law" section, the Court found that:

3.     The Court finds the evidence clear and convincing that RES intentionally violated this Court's order.

4.     RES violated the Court's order by making and selling a laminate constructed of a sheet of copper foil and a sheet of aluminum.

5.     One surface of each of the copper and the aluminum sheet was essentially uncontaminated and engageable with each other at the interface.

6.     The laminate has a band of flexible adhesive.

7.     **The band forms a continuous seal** joining the uncontaminated surfaces together at their borders.  (See "Findings of Facts and Conclusions of Law", Exhibit 7.)[3]

Regardless of the samples produced by RES and Mark Frater, the Court found that none

---

[3]Although a number of the following pieces of evidence were not listed in the Joint Claim Construction Statement, RES was unaware that JJA planned to make such blatant misrepresentations to the Court, and only submits these pieces of evidence to contradict such misrepresentations.  RES respectfully requests that the Court take judicial notice of pleadings, orders and submissions in the first action between RES and JJA.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

of the product taken from Pacific Circuit contained "numerous gaps and numerous small

beads of adhesive." The only product found to be in contempt was the RES product shipped

to Pacific Circuit which had a band forming a "continuous seal."[4]

Although it was and may still be JJA's opinion that the gapped product provided as

samples in the first contempt hearing by RES and Mark Frater violated the first permanent

injunction of July 29, 1994, the Court limited its contempt order to products shipped to

Pacific Circuit that had a continuous seal and violated the Partial Judgment of July 29,

1994. The judge did not hold the gapped samples provided by Frater to be in contempt. The

Court specifically recognized at the contempt proceeding that he could only hold RES and

Mark Frater in contempt of his previously issued injunction if the line of adhesive was

unbroken. The Court stated:

> So the question is only whether or not there was a continuous seal; and if so,
> did that constitute a violation of the injunction and judgment; or, in fact, was
> it only a product which had a broken line. And under the language as set forth
> in paragraph four, **a broken line would not be violative of the injunction**...
>
> I am very aware that [JJA] ha[s] some post-judgment motions, which I have
> been working on for some period of time, which address the question of
> whether paragraph four is proper in its scope, and I'm aware of that because
> it's your claim and assertion that the jury found that both a continuous
> unbroken line or a continuous broken line were found to be violations of the
> patent and infringing the patent.
>
> **But that was not included in this judgment.** The way this injunction is
> worded in paragraph four, it would limit, for purposes of this order to show
> cause, only a continuous unbroken line. But I recognize that we disagree.
> (Emphasis added.) (See Transcript of First Contempt Proceedings, attached
> as Exhibit 8, pgs. 8-9).

The "Findings of Fact" and "Conclusions of Law" entered on January 25, 1995, less

than six months after the Partial Judgment of July 29, 1994 was filed, in combination with

the transcript of the first contempt proceeding leave no doubt that the first contempt order

only found RES and Mark Frater in contempt for those products which were shipped to

---

[4] RES and Mark Frater attest that Pacific Circuits had been a long-standing customer of RES and had received RES product with a continuous seal prior to the first permanent injunction. There was no chain of custody established in the contempt hearing, therefore it is highly plausible that the contemptible product was in possession of Pacific Circuits prior to the first permanent injunction issuing.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

R.E. SERVICE CO., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF                    C-03-2549 SBA

Pacific Circuits on October 4 and October 11, 1994 and which had a "continuous seal," as enjoined in the partial judgment of July 29, 1994.

At the time the first contempt was at issue, JJA expressed dissatisfaction with the above mentioned injunction entered on July 29, 1994, ordering that RES and Mark Frater, etc, be:

> "permanently enjoined from making, using or selling a laminate constructed of a sheet of copper foil and a sheet of aluminum, one surface of each of the copper sheet and the aluminum sheet being essentially uncontaminated and engageable with each other at an interface, and a **band of flexible adhesive which forms a continuous seal**" (Exh. 4, ¶ 4).

In spite of the fact that JJA witnesses testified that a continuous band forming a complete seal was needed,[5] JJA brought a motion to amend its injunction to enjoin the manufacture of copper-aluminum laminates with a "substantially continuous line of adhesive" as instructed in Jury Instruction No. 15. (See First Action Jury Instruction No. 15, attached as Exhibit 9). JJA was successful and the Court altered the judgment to "broaden the language of the injunction" to include "a band of flexible adhesive which forms a substantially continuous band." (See "Revised Partial Judgment Pursuant to Fed. R. Civ. P. 54(b) Following Disposition of Post-Trial Motions", attached as Exhibit 10, ¶ 4).

On March 9, 1995, JJA moved ex parte for a second order to show cause re contempt. (See "Ex Parte Application For Second Order To Show Cause re Contempt", attached as Exhibit 11). On March 13, 1995 the Court ordered RES to show cause why it should not be held in contempt of the first and the amended injunction issued by the Court. (See "Defendant's Second Order To Show Cause re Contempt", attached as Exhibit 12). The matter was heard on April 13, 1995. (See *id.*) Almost six months later, the Court finally ruled on September 6, 1995[6] (the "second contempt order") that RES and Frater were again in contempt.

---

[5]See infra, section *re judicial estoppel*.

[6]JJA's brief incorrectly lists this date as September 26, 1995.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

1

2

         (c)     <u>The Second Contempt Order Did Not Find that RES's Product With Non-Continuous Seals Was In Violation of Any Injunction</u>.

3

        For a third time, JJA misrepresents to this Court a crucial development in the

4

history of these cases.  The second contempt did not hold RES in contempt for "further

5

modified AC3 and AC2 products with larger gaps in the adhesive."  Only four samples were

6

held in contempt in the second contempt order.  Those four samples: 1) had continuous

7

seals; 2) were made before the Revised Partial Judgment of January 25, 1995; and 3) were

8

held to be in violation of the original injunction which prohibited adhesive which formed a

9

continuous seal.

10

        In JJA's own brief regarding this second contempt, JJA stated:

11

12

    "At the contempt hearing on April 13, the Court will review 25 samples of RES product, **four of which were produced before RES received notice of the revised injunction**, and the remainder of which were made after the injunction was modified.  The evidence will establish that **the four pre-modification samples fall within the scope of the first injunction** and the remaining samples fall within the scope of the modified injunction."
(See "Reply Memorandum in Support of Johnson & Johnston Associates' Application For Second Order to Show Cause re Contempt", attached as Exhibit 13, pgs. 3-4).

13

14

15

16

The four samples made before the revised partial judgment of January 25, 1995 were the

17

only ones found to be in contempt.  In the second contempt order, the Court found that:

18

19

    7.    The products sold by RES **between August 6, 1994 and entry of the Revised Partial Judgment** violate the terms of this Court's permanent injunction."

20

21

22

    8.    The Court finds RES to be in willful contempt of this Court's injunction by making and selling AC2 and AC3 and by manufacturing and selling products in the amounts indicated above **between August 6, 1994 and entry of the Revised Partial Judgment**.  (See "Order re Second Contempt", attached as Exhibit 14, pgs. 5-6, ¶¶ 7-8).

23

        By JJA's own admission, the only samples made before the Revised Partial Judgment

24

were those first four samples which "fall within the scope of the first injunction." That first

25

injunction prohibited only product with a "continuous seal."  Moreover, JJA's own witness

26

at the Second Contempt proceeding, Robert Johnston, testified that:

27

    Q.    All right.  Going back to the four pre-contempt samples, did each sample that you reviewed have a band of flexible adhesive which formed a

28

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

7

continuous seal joining the uncontaminated surfaces together at their borders and defining a sealed substantially uncontaminated central zone?

A.    Three of the four did, the exception being the one that had no adhesive on one end...

Q.    Now, how did you determine that the other three samples had a continuous seal joining uncontaminated surfaces?

A.    Very much as I demonstrated earlier. On inspecting the product, I rolled the copper away from the aluminum to expose the joint where the aluminum, adhesive and copper came together.

Q.    Was there one of the samples that you were able to observe the adhesive on one edge?

A.    Yes. 210 I removed the copper about three to four inches back from the end of the product and I observed a **wide solid, uninterrupted band or stripe of adhesive** down that edge joining the two edges going down the other side. (See "Robert Johnston Testimony at Second Contempt", attached as Exhibit 15, pgs 8-17.)

JJA's papers submitted in support of the second contempt hearing argue that the samples before the January 25, 1995 Revised Partial Judgment violated the original injunction which required a "continuous seal." JJA's witness, Robert Johnston, testified that three of the four samples had a "wide solid, uninterrupted band or stripe of adhesive." The contempt order found only those pre-Revised Partial Judgment samples to be in contempt.

Importantly, JJA placed 21 post-Revised Partial Judgment samples of RES's non-continuous adhesive product in front of Judge Aguilar on April 13, 1995 in the second contempt proceeding. Judge Aguilar's contempt order was specifically limited to pre-Revised Partial Judgment product which violated the original injunction. (See Exh. 14, pgs. 5-6, ¶¶ 7-8). In fact, none of RES's non-continuous adhesive product was ever found to be in contempt, not in the first contempt proceedings and not in the second. JJA's assertions to the contrary are an incorrect interpretation of those contempt orders.

JJA may argue that the following paragraph from the Court's Second Contempt Order indicates that the samples in front of the Court had gaps, but it does not necessarily follow.

6.    These samples violate the terms of the Partial Judgment in that they contain a substantially continuous seal similar to the seal which formed the basis of the Court's contempt holding in the first contempt proceeding. These samples also violate the Revised Partial Judgment because each

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

8

contains a sheet of copper foil and a sheet of aluminum... and having a band of flexible adhesive which forms a substantially continuous band." (See Exh. 14, pg. 4, ¶ 6).

The four, pre-Revised Partial Judgment samples, contained continuous seals by JJA's own admission. A continuous band of adhesive would violate both the Partial Judgement and the Revised Partial Judgment, because a continuous band of adhesive obviously must also be "substantially continuous." There is nothing else that can be derived from this statement of the Court.

Following the contempt hearings, RES moved for recusal of Judge Aguilar. Recusal was granted on October 6, 1995. (See "Order Granting Plaintiff RES' Motion for Recusal Pursuant to 28 U.S.C. § 455(a)", attached as Exhibit 16.)

After recusal, JJA and RES entered into a stipulated final judgment in which RES agreed not to make any further copper-*aluminum* laminates in November of 1995. (See "Stipulated Final Judgment", attached as Exhibit 17.)

### 2.    The Second Action

In late 1996, RES began manufacturing a new form of laminate (SC2 and SC3) which joined at least one sheet of copper foil and a substrate made of *stainless steel*. JJA filed suit, entitled Johnson & Johnston Associates v. R.E. Service, et al. No C97-4382 CRB (the "Second Action"), alleging that RES's steel substrate infringed under the doctrine of equivalents.

In 1998 the Court granted JJA's motion for summary judgment that RES was collaterally estopped from contesting infringement of the adhesive claims that had been litigated in Trial One. (See Judge Breyer's Order of March 13, 1998, attached as Exhibit 18.) This summary judgment was granted because the exact same claims from the exact same patent were litigated in the Second Action. The Court later prohibited RES at trial from asserting any non-infringement based on its "gapped adhesive." (See Judge Breyer's Order of July 31, 1998, attached as Exhibit 19.) The jury unsurprisingly returned a verdict of infringement by equivalents.

On appeal, the Federal Circuit, sitting *en banc*, ruled that the SC2 and SC3 products did *not* infringe under the doctrine of equivalents.  See *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002) (*en banc*).  The Federal Circuit held that because steel was mentioned in the specifications, but not claimed, it had been dedicated to the public and could not form the basis fo a claim of infringement by equivalents.  *Id.* at 1055.

### III.

### THE LAW OF CLAIM CONSTRUCTION

**A.     INTRINSIC/EXTRINSIC EVIDENCE**

It is well-settled law that in interpreting a claim, the court should look first to the intrinsic evidence of record.  This includes the patent itself, the claims, the specification and, if in evidence, the prosecution history.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "Claims must be read in view of the specification. . . it is the single best guide to the meaning of a claim term." *Id.*

Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. *Markman,* 52 F.3d at 980.  While later cases have allowed courts to rely on dictionaries in the claim construction phase, it is not necessary in this case as the terms at issue can be construed from the plain language of the patent, or with the help of the actual inventor.

**B.     CLAIM CONSTRUCTION**

In terms of construing the claims, the first step is to look to the words of the claims themselves to define the scope of the patented invention.  *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620, (Fed. Cir. 1995).  The court will usually give words in a claim their ordinary and customary meaning; however, a patentee can be his/her own lexicographer and use a term in a manner other than its ordinary

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

meaning, as long as the special definition of the term is clearly stated in the patent specification or file history. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388, (Fed. Cir. 1992).

The second step is to review the specification to see if the inventor used the term in a manner inconsistent with its ordinary meaning. The specification serves as the "dictionary" when it expressly defines terms used in the claims. *Markman*, 52 F.3d at 979. "Claims must be read in view of the specification, of which they are a part." *Id.* "The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

Third, the court may also consider the patent's prosecution history (if in evidence). *Markman*, 52 F.3d at 980; *Graham v. John Deere*, 383 U.S. 1, 33 (1965).

### IV.

### CONSTRUCTION OF THE DISPUTED JJA CLAIM TERMS

**A.     COLLATERAL ESTOPPEL**

JJA has urged this Court not to consider evidence adduced in Trial One in construing the claim language regarding "flexible adhesive" in the '596 patent and "band of flexible adhesive" in the '315 patent. JJA urges that the doctrine of collateral estoppel precludes any such consideration. The requirements for collateral estoppel can not be met in this instance, but even if they were, the Court should use its discretion not to apply the doctrine to the facts as bar.

In determining the effect of prior litigation on issues of claim construction, the same requirements apply as with other judicial determinations. See *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1323 (Fed. Cir. 1987). Because collateral estoppel is not a matter requiring application of this court's uniform national law, the law as

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

articulated by the 9th Circuit governs. See *Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574, 1576 (Fed. Cir. 1989). For collateral estoppel to foreclose relitigation of an issue: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action. See *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1320 (9th Cir. 1992).

### 1. The Court Should Not Be Influenced By Judge Breyer's Ruling On Collateral Estoppel.

Judge Breyer applied the doctrine of collateral estoppel in the second action. However, in that second action, the patent and claims at issue were identical to the ones that had been before Judge Aguilar. Judge Breyer's determination to apply collateral estoppel was filed on March 13, 1998. By that time, the '596 patent had issued, but the complaint in the Second Action was never amended to add the '596 patent. JJA's failure to add the '596 to the Second Action was a strategic play to prevent the worrisome contents of the file wrapper from being introduced. As we shall see *infra*., the '596 file wrapper unequivocally shows that the PTO rejected the very claims construction JJA seeks to have the Court adopt herein.

There is no other reason to explain the failure to amend the Second Action to include the allegations of infringement of the '596 patent. JJA has filed the lawsuit at bar, based on the '596 and '315 patents, accusing the very same products, SC2 and SC3, that were at issue in the Second Action.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

R.E. SERVICE CO., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF          C-03-2549 SBA

### 2.    The Issue Is Not Identical.

The first prong of the test for collateral estoppel cannot be met for the '596 patent. "The party asserting collateral estoppel must show that the estopped issue is identical to an issue actually litigated and decided in the previous action." See *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1031 (9th Cir. 2001); *Amgen, Inc. v. Genetics Inst.*, 98 F.3d 1328, 1331-32 (Fed. Cir. 1996) (identical product and identical specification).  Here there is no doubt that the language of the '596 claim is not identical to the language of the '050 claim. The '050 patent claimed a "band of flexible adhesive."  In the '596 patent, the phrase "band of" has been deleted.  The deletion of that phrase establishes that the two claims are not identical.

There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.  See *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 457 (S.D. NY 2003).  Even a small change means the issues are no longer identical and forecloses the possibility of collateral estoppel.  *Foster v. Hallco Mfg. Co.*, 1997 U.S. App. LEXIS 18989, *10-11 (Fed. Cir. 1997).  In *Foster* a  change of only one word in the claim was held sufficient to preclude the application of collateral estoppel:

> "While the "movable portion" language in claim 9 of the '469 patent is similar to the "movable central portion" language in the '022 patent, the definition of this element is different and more specific in the '022 patent. Thus, the first element of the claim preclusion test -- that the issue is identical to that involved in the prior action -- has not been met." *Id.*

Since the claim language in the '596 patent is not identical to the language already considered in the '050 patent, the first prong of collateral estoppel has not been satisfied.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

13

1   The prosecution history for '596 will be analyzed below.  The reasons why the '596 used

2   different language will become manifest and militate against the application of collateral

3   estoppel.

4

5           **3.      Construction of "Band of Flexible Adhesive" Was Not A Critical**
            **and Necessary Part of the Judgment In the First Action.**

6

7           The construction of "band of flexible adhesive" in Trial One should not serve as a

8   basis for collateral estop in this case because that construction was not a "critical and

9   necessary part of the judgment."  See *Clark*, 966 F.2d at 1320;  *Montana v. United States*,

10  440 U.S. 147, 153 (1979)(to give preclusive effect to a particular finding in a prior case,

11  that finding must have been necessary to the judgment rendered in the previous action);  see

12  also *In re Freeman*, 30 F.3d 1459, 1466 (Fed. Cir. 1994).  The purpose of this requirement

13  is to prevent the incidental determination of a nonessential issue from precluding

14  reconsideration of that issue in later litigation. See *Mother's Restaurant, Inc. v. Mama's*

15  *Pizza, Inc.*, 723 F.2d 1566, 1571 (Fed. Cir. 1983).

16

17          Specifically, in terms of previous determinations of claim construction, the Federal

18  Circuit has held that "judicial statements regarding the scope of patent claims are entitled to

19  collateral estoppel effect in a subsequent infringement suit only to the extent that

20  determination of scope was essential to a final judgment on the question of validity or

21  infringement; further that such statements should be narrowly construed. . . . " *A.B. Dick Co.*

22  *v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed. Cir. 1983), .  In this case, the inclusion of the

23  term "substantially" was not essential to either the finding of infringement or validity in the

24  first trial.

25

26

27

28

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

14

a)    "Substantially" Was Not Essential For Finding Infringement.

If a judgment could have been based alternative findings, a claim interpretation that is essential to only one of those findings will not be given preclusive effect because it does not meet the "essential to final judgment" requirement. See *Masco Corp. v. United States*, 303 F.3d 1316, 1329-31 (Fed. Cir. 2002) (holding that collateral estoppel did not apply to the claim interpretation when there were alternative findings, any one of which would have been sufficient to support the judgment of noninfringement, because the claim interpretation was not essential to final judgment); see also *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1538 (Fed. Cir. 1995)(citing bright line standard endorsed the Restatement (Second) of Judgments which maintains that issue preclusion should never lie any time a judgment has been based on alternative grounds, any single one of which standing alone could have supported the judgment).

The word "substantially" was not essential to a finding of infringement based on any products with "continuous bands forming complete seals."  A product with a continuous band would undoubtedly have a "band of flexible adhesive" whether that band was required to be continuous or not.  Continuous adhesive product that fit this description was presented to the jury as evidence of RES' infringement and most likely was their basis for so finding.

The inclusion of the word substantially was essential only if non-continuous(gapped) product were found to infringe.  Although JJA did not focus their argument on this area, gapped adhesive products were in front of the jury based on RES' contention of invalidity. (See Plaintiff's claim construction brief, pg. 7, citing '596 Prosecution History at J000659-J000662).  Although it is highly unlikely that the finding of infringement was

actually based upon gapped product, this is the only possibility whereby JJA can establish that the inclusion of "substantially" was essential to the judgment.  But because there was another alternative, which did not rely on the inclusion of "substantially", collateral estoppel cannot be applied.  *Masco Corp*, 303 F.3d at 1329-31

        b)    <u>Construction of "Band of Flexible Adhesive" Was Not A "Critical And Necessary Part of the Judgment."</u>

Neither could the word "substantially" have been essential to the jury's finding of validity of the '050 patent.  The broader a patent's claims are construed, the more likely the finder of fact will determine that prior art invalidates the claim.  A construction of "band of adhesive" which includes a "substantially continuous" band of adhesive is obviously broader than a construction which is limited to a continuous band of adhesive.  If the broader construction -- "substantially continuous" -- was not not found to be invalid in light of the prior art, then the narrower claim -- continuous band -- could not have been found invalid either.  Therefore the inclusion of the word "substantially" in the construction of the phrase "band of flexible adhesive" could not have been a "critical and necessary part of the judgment."

**4.**    **Collateral Estoppel Is Not Mandatory.**

The doctrine of issue preclusion is premised on principles of fairness.  See *Blonder-Tongue Lab. v. University of Illinois Found.*, 402 U.S. 313, 324-25 (1971)(noting that "overriding fairness" considerations may dictate that collateral estoppel should not apply). A court is not without some discretion to decide whether a particular case is appropriate for application of the doctrine. *A.B. Dick*, 713 F.2d at 702. Accordingly, under certain circumstances, even where all of the requirements of issue

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

preclusion have been met, the doctrine will not be applied.  See *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1519 (9th Cir. 1985). "If there is doubt... collateral estoppel will not be applied." *Id.* at 1518.   See also *Montana*, 440 U.S. at 164 n.11("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation.")

This discretionary application of the doctrine of collateral estoppel has been specifically recognized in cases regarding previous determinations of claim construction. See *In re Freeman*, 30 F.3d at 1467 (noting that issue preclusion is based on the principle of fairness and that "under certain circumstances, where all of the requirements of issue preclusion have been met, the doctrine will not be applied").

In this instance there are many equitable factors that militate against the application of collateral estoppel.  First, the claim construction in the first trial was adopted, explained, and expanded over the course of more than a year, first through the jury instructions, and then through the altered judgment, the first contempt proceeding, and finally the second contempt proceeding.  This "moving target" aspect of the construction should be examined thoroughly instead of blindly relying upon its final resting place.  Immediately after the jury trial, when the Judge's memory was fresh, the Court issued an injunction that was in line with the facts of the case, and to use the Court's own words, that prohibited RES from manufacturing only products with "unbroken lines" of adhesive.  During the succeeding six months, the original Partial Judgment was amended, and another contempt order was issued containing  findings of fact inconsistent with the first contempt order.

In addition, the overall fairness of proceedings were put into question by Judge Aguilar's own recusal, a month after the second contempt proceeding. Although Judge Aguilar departed by writing a scathing interpretation of the conduct of RES and Mark Frater, the fact remains that he granted recusal because of concern regarding **his** own impartiality.

**5. Collateral Estoppel Should Not Be Applied To the '315 Patent**

For all of the reasons, cited in subsections 2 & 3, collateral estoppel should not be applied to the claim construction of the claims of the '315 patent.

**B. TERMS OF THE '596 PATENT**

**1. "Flexible Adhesive"**

(a) "Flexible Adhesive" Is Ambiguous.

JJA asserts in its opening papers that the term "Flexible Adhesive" is unambiguous. Notably, JJA makes this assertion without submitting a quick and simple definition to follow. Nor does JJA offer any support for the proposition that the language is unambiguous.

(b) <u>Judicial Estoppel Prevents JJA From Contending A Complete Seal Is Not Needed</u>

The claim terms "flexible adhesive" and "band of flexible adhesive" are central to this case. In the First Action, as described above, JJA repeatedly took the position that a "band of flexible adhesive" (as described in the '050 patent and the '315 patent) requires a continuous band of adhesive that forms a complete seal, thereby establishing a substantially uncontaminated central zone. This is how JJA argued that the '050 was not invalid in the face of prior public use of a gapped product in RES's AC2 and AC3 products. According to

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

18

the PTO, the present of gaps in the adhesive in RES's prior art was the sole difference between it and the invention embodied in the '050.  (See Examiner's Action Letter of July 11, 1996, attached as Exhibit 21.)

Now, however, in this trial JJA advances a proposed definition for the band of flexible adhesive that requires only a "substantially continuous" line of adhesive, citing the jury instruction given in the first trial.  It is noteworthy that at no time during the first trial did JJA offer *any* trial testimony using the words "substantially continuous line."  This is an impermissible change of position that JJA should be estopped from taking.

Judicial estoppel is an equitable doctrine that "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Helfand v. Gerson,* 105 F.3d 530, 534 (9th Cir. 1997); *Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 605 (9th Cir. 1996).  The "inconsistent position" may consist of an expression of intention, a statement of fact, or a legal assertion. *Helfand,* 105 F.3d at 535.  In essence, judicial estoppel prevents the party from "invok[ing] the authority of one tribunal to override a bargain made with another." *Wang Labs, Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 358 (Fed. Cir. 1992).  The doctrine of judicial estoppel is recognized in patent cases and is governed by the law of the regional circuit in which the trial court sits.  (*Id.*)

During the first litigation between JJA and RES, JJA took the unyielding position that the '050 patent calls for a "continuous band" of adhesive forming a "complete seal" around the central zone.  JJA took the position that the '050 patent did not "read on" Mr. Frater's prior art because it did not contain a continuous "band of adhesive" forming a

"complete seal" which protected the central zone from contamination. JJA also argued that the "complete seal" formed by this continuous "band of adhesive" was the '050 patent's fundamental innovation of the '050 over prior art. JJA's witnesses included James Johnston, the inventor of CAC and owner of the '050 patent; John Fischer, an expert in the manufacture of printed circuit boards; Paul Henon, a legal expert in patent prosecution and interpretation; Albert Bergun, JJA's director of engineering; Robert Johnston, the inventor's brother and a JJA sales manager; and Kenneth Piorier, JJA's vice president of sales and marketing. They all testified that the band of adhesive had to be continuous.

The terms "continuous" or "seal" do not appear anywhere in the '050 patent. However, **JJA's experts John Fisher and Paul Henon opined that the band of adhesive disclosed in the '050 patent must be "continuous"**, as opposed to gapped or broken, in order to create the "substantially uncontaminated central zone" which is an express element of the patent's claims. (See Fischer Testimony in First Action, 431:24-432:1, 499:20 attached as Exhibit 22; Henon Testimony in First Action, 739:21-22; 746:23-747:3; 758:14-23, attached as Exhibit 23.) As Mr. Fisher testified, the continuous adhesive band is designed to present "a sealed package to the manufacturing floor which is completely clean and dirt free and prevents any other contamination from getting into it." (See Exh 22, 432:4-6.) It cannot serve this purpose unless it is continuous. (See Exh. 22, 457:23-3; 460:12-462:2; 499:20-500:3.)

Mr. Fisher distinguished the '050 patent from other, less successful attempts in the industry to maintain the cleanliness of the copper foil, such as plastic covers and magnets, because those methods did not completely protect the critical surfaces from

contamination.  According to Mr. Fisher, the "substantially uncontaminated central zone" created by the continuous band of adhesive is the invention's most signficant innovation over prior art.  (See Exh. 22, 433:20-24, 444:23-445:8; 503:15-25.)  Mr. Fisher and Mr. Henon both testified that, in their opinion, a product using a discontinuous or gapped adhesive would not be the product which is described by the '050 patent.  (See Exh. 22, 506:14-19; Exh. 23, 881:24-884:9.)

The construction of the patent urged by JJA's experts was corroborated by CAC's inventor, James A. Johnston.  Mr. Johnston testified that in developing CAC he had sought a way to prevent contamination of the copper surface by creating a "complete seal" around the usable area of the board.  He had investigated numerous methods of attaching the aluminum and copper and found that unless the surfaces were completely sealed together, a "bellows effect" would result, literally pulling in contaminants from the air.  (See James Johnston Testimony in First Action, 1107:8-17, attached as Exhibit 24.)  He ultimately hit on using a continuous band of flexible adhesive to seal the perimeter of the copper-aluminum interface.  (See Exh. 24, 1108:2-7, 1111:16-20.)

JJA's Director of Engineering, Albert Bergun, confirmed that the continuous band of adhesive is what protects the central zone from contamination.  (See Bergun Testimony in First Action, 126:6-7; 128:21-129:11; 146:21-22; 147:25-148:5; 150:16-18; 155:8-9, attached as Exhibit 25.)  Kenneth Piorier, JJA's vice president of sales and marketing, described this feature as CAC's main selling point in the circuit board industry.  (See Piorier Testimony in First Action, 294:15-296:3 attached as Exhibit 26.)  Finally, other witnesses testified that the original versions of RES's products, AC2 and AC3 (i.e., from

1990 and earlier) did not use a continuous band of adhesive, and that the adhesive, therefore, did not form a complete seal around the central zone.  (See Robert Johnston Testimony in First Action, 240:4-20; 245:1-25, attached as Exhibit 27; Gishi Testimony in First Action, 518:17-519:2, attached as Exhibit 28.)

The conclusions expressed by JJA's witnesses were echoed by JJA's attorney in closing argument.  Counsel for JJA argued "the invention which is claimed in the patent has a seal" (See JJA's Counsel's First Action Arguments, 2346:17-18, attached as Exhibit 29), as compared to the adhesive used in the RES prior art, which is "not continuous, it's not a seal, it's not what's claimed in the patent" (See Exh. 29, 2345:10-12).  JJA's counsel further stated that the samples were "at best what RES was trying to do in January-February 1990, but that's not a complete seal" (See Exh. 29, 2359:9-11.)  He claimed "[w]hat R.E. Service was trying to do was just attach.  They weren't trying to seal."  (See Exh. 29, 2361:2-4.)

JJA argues that they cannot now assert that "band of flexible adhesive" requires a complete seal because they "lost" this argument before Judge Aguilar.  This is disingenuous.  JJA admits that it was they who submitted the jury instruction that "band of flexible adhesive" meant "substantially continuous."  In the first trial, JJA's lawyers did not "lose" their argument regarding the meaning of that claim term; they simply made a strategic decision to switch their position.  During trial, every JJA employee, every expert retained by JJA, and even the inventor John Johnston himself testified that the band of flexible adhesive required a complete seal.  In the interests of justice, JJA should be judicially

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

estopped from changing the position adopted by those actually involved with the invention itself.[7]

Having prevailed on validity at the first trial by arguing that the prior art of RES did not employ a *continuous* band of adhesive forming a complete seal around the central zone, JJA cannot now be heard to contend that the '596 patent should be construed to cover discontinuous beads of adhesive which admittedly do not come close to creating a complete seal.

(c)    The PTO Public Use Rejection Confirms That JJA Is Not Entitled to a Non-continuous Adhesive Under the '596 and '315 Patents.

During the prosecution of the '596 patent, RES successfully petitioned for a public use proceeding based on RES's prior public use of AC2 and AC3. Although as part of the settlement of the First Action RES was forced to withdraw its petition for a public use proceeding, JJA's claims were nevertheless rejected by the PTO based on RES's prior public use. In that rejection, the PTO found that AC3 was in public use before the priority date for the '596 patent. (See Examiner's Action Letter of July 11, 1996, attached as Exhibit 30.)

Specifically, the PTO examiner concluded that:

"It is clear that in or around January or February of 1990, a product was marketed in the form of samples. This product was a multi-layer laminate and was sold by R.E. Service Co. in the United States. The laminate comprised sheets of copper around a sheet of aluminum. Adhesives, including rubber cement, was beaded or streaked along the

---

[7]RES could not make this argument because it had admitted making a continuously banded product.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

inner periphery of the laminate to bond the copper and aluminum together.  The inner

surfaces of the laminate were substantially free of contamination, since the product was

supposed to be used in a circuit board lamination process which seeks  to avoid

contamination of the circuitized central zone."  (See Exh. 30.)

Based on these conclusions, the PTO examiner found that AC3 anticipated the

broadest claims found in the application for the '596 patent, which read as follows:

> A component for use in manufacturing articles such as printed circuit
> boards comprising:
> a laminate constructed of a sheet of copper foil which, in a finished
> printed circuit board, constitutes a functional element and a sheet of
> aluminum which constitutes a discardable element;
> One surface of each of the copper sheets and the aluminum sheet
> being essentially uncontaminated and engageable with each other at an
> interface;
> the uncontaminated interface of the sheets having a central zone
> inwardly of the edges of the sheets; and
> adhesive located between the sheet outwardly of the central zone.(See
> Exh. 30).

The only language that was altered between this public use rejection and the eventual

issuance of the patent appears in the final paragraph of the '596 claims, which was amended

to read:

> "flexible adhesive joining the uncontaminated surfaces of the sheets together at their

borders and defining substantially uncontaminated central zones inwardly of the edges of

the sheets and unjoined at the interface such that the substrate facilitates the handling of the

foil."  (See. Exh. 1.)

The amended portion of the claim must necessarily be different than that of the prior

art or it would not have been allowed.  In its rejection, the PTO found that RES's AC2 and

AC3's "adhesives, including rubber cement, was beaded or streaked along the inner

periphery of the laminate to bond the copper and aluminum together."  The location and the pattern of the flexible adhesive was more precisely explained to require the adhesive to define an essentially uncontaminated central zone.[8]  A "beaded or streaked" adhesive was not available to JJA under the '596 and later related '315 patent.

          (d)       <u>A Continuous Band and Complete Seal Are Consistent With The Specifications In the Patents</u>.

JJA's testimony at the First Action, the public use rejection by the PTO based on RES's prior art with "beaded or streaked adhesive", and JJA's specifications all are consistent with a requirement of a continuous band of adhesive forming a complete seal. The specifications of the '596 and '315 patents identify the complete seal in several places:

> "the band 40 of flexible adhesive 40 seals the layers of copper and aluminum before and during the manufacturing process against the intrusion of prepreg dust or any other contaminant which could result from particles in the air, fingerprints, grease spots, or the like." (See Exh. 1, Col. 6. Lns. 11-15).

This theme of seal which would prevent any contaminants from entering the substantially uncontaminated central zone was continued later when it was specified that:

> "Because of the presence of the band of adhesive 40 that originally secured the copper and aluminum layers together, no prepreg dust or other contaminant has been able to reach the zone CZ before and during the manufacturing process." (See Exh. 1, Col. 8. Lns. 7-10).

Because these specifications agree with the requirements that the JJA employees and experts originally testified to in the first action, they should control the meaning of "band of flexible adhesive, and thereby "flexible adhesive."

---

[8]The PTO's allowance of JJA's impliedly means that the prior art of RES cited in the application was not covered by the amended claims.  Similarly, when prosecuting the applications for RES's own patents, the 40%-60% gaps that were allowed must have been different from cited materials.  RES cited the '050, '596 and referenced numerous portions of the First Action.  The PTO allowed the RES with claims of 40% to 60% gaps in the adhesive.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

(e)    JJA disclaimed "substantially continuous line" in '596.

Notwithstanding that all of their witnesses in the first trial testified under oath that a complete seal and continuous band were needed, and regardless of the fact that the specification pointedly explains that such a seal is needed, JJA continues to assert that a "substantially continuous band of adhesive" is sufficient to explain their claims in the '596 and '315 patents.  But in the prosecution of the '596, the PTO examiner specifically rejected the phrase "substantially continuous line."  JJA can not now ask for the Court to construe the claim by use of a phrase that was specifically abandoned during prosecution of the patent.

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  Contrary to prosecution history estoppel which limits the doctrine of equivalents, *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 30 (1997) prosecution disclaimer applies to the determination of literal infringement by excluding from the claim construction any claim scope that has been clearly and unmistakably disavowed during prosecution. See *Omega*, 334 F.3d at 1323- 26.

The phrase "substantially continuous line of flexible adhesive" has specifically been rejected by the USPTO and disclaimed by JJA during the prosecution of the '596 patent.  In the application of 07/955,121 (which eventually issued as the '596 patent) the examiner rejected all claims containing the phrase "substantially continuous" line or band on May 2, 1997.  (See Examiner Action Letter of May 2, 1997, attached as Exhibit 31.)  The examiner

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

did this for two for two reasons: 1) The specification, although enabling for a "band of flexible adhesive" was not enabling for a "substantially continuous line... The claims are broader than the enabling disclosure"; 2) The claims were indefinite because it was not clear "what is meant by the expression 'substantially continuous line/band.'"  (See Exh. 31).

In response to this rejection, the phrase "substantially continuous line" was deleted from each and every claim of the '596 patent.  The U.S. Supreme Court has held that it is utterly inconsistent with the patent system for a patent applicant to specifically abandon language in a claim and then urge the Court to define the claim by use of the specifically abandoned language.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,  535 U.S. 722, 736-37 (2002) ("A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112.")

JJA's argument that *Festo* does not present a problem in this case because the amendment to drop the words "substantially continuous line" actually *broadened* the claims is directly contrary to the PTO's explicit findings.  The PTO examiner specifically rejected the claims containing the words "substantially continuous" line or band, finding that "substantially continuous" was **"broader than the enabling disclosure."**[9]  (See Exh. 31 paragraph 4).   JJA amended the claims pursuant to that rejection, and the patent issued.  If the claim language before the amendment was too broad for the enabling disclosure, any claim that the PTO allowed immediately thereafter must necessarily have been narrower.

---

[9]JJA's assertion on page 17 of their brief that applicant's statements provide support for the claim deletion is of no moment.  What matters is why the PTO examiner forced JJA to delete the term, not JJA's self-serving statements later in their amendment.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

27

Because the patent eventually issued, JJA must either concede that the amendment narrowed their claims, with the effect being that JJA has forever disclaimed the "substantially continuous" language, or admit that their patent is invalid because the claims which were originally broader than the enabling disclosure (as ruled by the examiner), only became broader (as JJA now contends).

(f)     Previous Restrictions in the Prosecution of the '050 Patent Also Prevent The Alleged "Broadening" of the Claim.

During the prosecution of the application issuing into the '050 patent, the parent patent to the '596 and '315, the PTO initially rejected all of plaintiff's claims, on the ground they were obvious in view of the patent to *Kobayashi*, No. 4,781,969.  (See Examiner's Action Letter of March 17, 1992, attached as Exhibit 32).  *Kobayashi* disclosed a method of preparing printed circuits using an aluminum carrier and a copper layer attached to a substrate with adhesives.  (See U.S. Patent No. 4,781,969, attached as Exhibit 33).  In the initial claim language as submitted, the claims called for:

> "a band of flexible adhesive joining the uncontaminated surfaces of the sheets together at their borders and defining a substantially uncontaminated central zone interiorly of the edges of the sheets and unjoined at the interface." (07/750,798 application, as Exhibit 34).

After rejection by the PTO, JJA requested reconsideration.  Among other differences, JJA argued that the adhesive in *Kobayashi* did not join uncontaminated surfaces of the copper and aluminum together at their borders, and did not create a substantially uncontaminated central zone.  (See Amendment of April 1, 1992, attached as Exhibit 35, pgs. 5-6)  On June 12, 1992, the PTO allowed JJA's patent stating, "[t]here is no

teaching or suggestion in the prior art directed to the specific edge adhesive discloses [sic] in this case."  (See Examiner's Action Letter of June, 12 1992, attached as Exhibit 36.)

The PTO's comment during the allowance of the claims makes it clear that the location of the adhesive was key to the patentablity of the '050 patent.  JJA can not contend that in a child patent of the '050, the patent office allowed JJA to expand the scope of the adhesive claim so that it could be placed anywhere between the layers of the copper and the substrate.  *Kobayashi*'s prior art limited the '050 patent and all its progeny to the "specific edge adhesive" explained in the '050 patent

###   2.      Metal substrate sheet

JJA's proposed construction of "metal substrate sheet" sheds no light on the claim term -- it simply incorporates the same words in a different order.  JJA proposes to construe "metal substrate sheet" to mean "sheet of metal."  This construction does not provide an adequate description of the meets and bounds of the patent claims.

JJA argues that its construction of this term is based on the plain and ordinary meaning of the words, as well as the dictionary definition.  Yet, JJA turns its head to the plain and ordinary meaning cited throughout the specification.  In claim construction analysis, the Federal Circuit believes the specification to be highly relevant, stating "Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

JJA does not raise objection to the addition of nickel alloy or stainless steel -- JJA cannot object to these terms as they clearly define the term "metal substrate sheet."  Nickel

alloy and stainless steel are both mentioned in the written description at column 4, lines

61-64:

> "While aluminum is currently the preferred material for
> the substrate, other metals, such as **stainless steel or
> nickel alloys**, may be used.  In some instances, such as
> in laminating plastic credit cards, polypropylene can be
> used."  [Emphasis added]

Therefore, proper construction of "metal substrate sheet" must include the stainless

steel and nickel alloy limitations.

RES will stipulate that "carbon steel" can be deleted from the proposed construction,

but maintains that it should include "nickel alloy or stainless steel" as these words are

consistent with the intrinsic evidence contained in the '596 patent.

### 3.    Sheet of steel

The arguments for and against the construction of this term are essentially contained

within the section on metal substrate sheet.  RES incorporates by reference its law and

argument from those sections.

### 4.    Essentially uncontaminated

JJA proposes a construction that includes "no more than some minimum amount"

(ie *some*) while RES proposes a construction that includes "no particulate matter of

measurable size" (i.e., *none*).  JJA's proposed construction includes words not found in the

patent claims or specification -- "some minimum amount" or "undesirable substances."

Rather, the written description of the '596 actually contains words closer to the

construction proposed by RES -- "particulate matter" and "measurable size."  At column 5,

lines 48-51:

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

R.E. SERVICE CO., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF          C-03-2549 SBA

1
2
3
4

> Since the contacting surfaces are ***"virgin"***, or at least ***as
> clean as is physically possible*** to make them, the border
> 40 creates a substantially uncontaminated central zone
> CZ interiorly of the edges of the sheets.  [Emphasis
> added]

5

6

7

8

9

10

11

"Virgin" or "as clean as physically possible" fits closer to *none* (as proposed by RES) rather than *some* (as proposed by JJA).  "Some minimum amount," as proposed by JJA, is an amorphous, unspecified, and ambiguous definition that does not satisfy the notice requirement of patent law.  "No particulate matter of measurable size," as proposed by RES, better tracks the plain language of the patent (claim and description), and more clearly defines the metes and bounds of the patent claim.

12

13

14

The '596 patent description even goes so far as to define the type of undesirable particulate matter.  At column 6, lines 11-15:

15

16

17

18

> Thus, the band 40 of flexible adhesive 40 seals the layers of
> copper and aluminum before and during the manufacturing
> process against the intrusion of ***prepreg dust or any other
> contaminant*** which could result from ***particles in the air,
> fingerprints, grease spots, or the like***.  [Emphasis added]

19

20

21

22

23

24

25

26

Rather than generally outline "some minimum amount" of undesirable matter, the '596 patent specifically defines the amount of permitted contaminants -- none (the band of flexible adhesive seals the layers "against intrusion of . . .").  Furthermore, the '596 specifies the exact type of particulate matter to avoid -- prepreg dust, contaminants, particles, fingerprints, grease spots, etc.  The intrinsic evidence clearly supports RES's construction of "no particulate matter of measurable size."

27

28

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

R.E. SERVICE CO., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF                C-03-2549 SBA

5.    **Substantially uncontaminated central zone**

The arguments for and against the construction of this term are essentially contained within the sections on flexible band of adhesive and essentially uncontaminated.  RES incorporates by reference its law and argument from those sections.

**B.    '315 PATENT**

RES agrees with JJA that the arguments for and against the construction of four terms in the '315 patent are essentially identical to the arguments from the '596 patent.  RES incorporates by reference its law and argument from those sections.

**IV.**

**CONCLUSION**

Proper interpretation of disputed claim terms focuses on the language of the patent.  However, JJA strays far from that language in putting forth its version of the construction of the disputed terms.  Strict adherence to the language of the patent spotlights JJA's aggressive, albeit incorrect, interpretation.  More importantly, strict adherence to the language of the patent bolsters RES's position with respect to each of the disputed JJA patent terms.

RES respectfully requests that the Court adopt its proposed construction of the disputed claim terms and/or phrases.

Dated:  April 12, 2004                                    ROBINSON & WOOD, INC.

By_____/s/_____
                                                            ARCHIE S. ROBINSON
                                                            Attorneys for Defendant and
                                                            Counter-Claimant R.E. SERVICE
                                                            CO., INC.

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

R.E. SERVICE CO., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF                    C-03-2549 SBA

1    #223523

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   History of Litigation Between the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    The '050 Patent and Prior Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    The '596 and '315 Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.    Prior Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            1.    The First Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                  (a)   The Jury Did Not Find RES' and Mark Frater's
                        Infringement Willful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                  (b)   The First Contempt Order Did Not Involve
                        Gapped Adhesives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                  (c)   The Second Contempt Order Did Not Find that
                        RES's Product With Non-Continuous Seals Was
                        In Violation of Any Injunction . . . . . . . . . . . . . . . . . . . . . . 6

            2.    The Second Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  The Law of Claim Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Intrinsic/Extrinsic Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    Claim Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   Construction of the Disputed JJA Claim Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A..   Collateral Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    The Court Should Not Be Influenced By Judge Breyer's
                  Ruling on Collateral Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            2.    The Issue Is Not Identical . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            3.    Construction of "Band of Flexible Adhesive' Was Not

A Critical and Necessary Part of the Judgment In the First Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    (a)    "Substantially" Was Not Essential For Finding Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    (b)    Construction of "Band of Adhesive" Was Not A "Critical And Necessary Part of the Judgment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    4.    Collateral Estoppel Is Not Mandatory . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    5.    Collateral Estoppel Court Not Be Applied To the "315 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.    Terms of The '596 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    1.    "Flexible Adhesive" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    (a)    "Flexible Adhesive" Is Ambiguous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    (b)    Judicial Estoppel Prevents JJA From Contending A Complete Seal Is Not Needed . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    (c)    The PTO Public Use Rejection Confirms That JJA Is Not Entitled to a Non-Continuous Adhesive Under the '596 and '315 Patents . . . . . . . . . . . . . . . . . . . 23

    (d)    A Continuous Band and Complete Seal Are Consistent With The Specifications In the Patents . . . . . . . . . . . . . 25

    (e)    JJA Disclaimed "Substantially Continuous Line" in '596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    (f)    Previous Restrictions In the Prosecution of the '050 Patent Also Prevent the Alleged "Broadening" of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    2.    Metal Substrate Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    3.    Sheet of Steel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    4.    Essentially Uncontaminated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

1

    5.  Substantially Uncontaminated Central Zone . . . . . . . . . . . . . . . . . . . . . . . . 32

  B.  '315 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Robinson & Wood, Inc.**
**227 North First Street**
**San Jose, CA 95113**
**(408) 298-7120**

R.E. SERVICE CO., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF     C-03-2549 SBA

# TABLE OF AUTHORITIES

**Page**

*A. B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700 (Fed. Cir. 1983)  . . . . . . . . . . . . . . . . . . . . 14, 16

*Amgen, Inc. v. Genetics Inst.,* 98 F.3d 1328 (Fed. Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Astra Aktiebolag v. Andrx Pharms., Inc.,* 222 F.Supp. 2d 423 (S.D. NY 2003)  . . . . . . . . . . . 13

*Bell Communications Research, Inv. v. Vitalink Communications Corp.,*
      55 F.3d 615 (Fed. Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Blonder-Tongue Lab. v. University of Illinois Found.,* 402 U.S. 313 (1971)  . . . . . . . . . . . . . . 16

*Clark v. Bear Stearns & Co., Inc.,*    966 F2d 1318 (9th Cir. 1992)   . . . . . . . . . . . . . . . . . . 12, 14

*Comair Rotron, Inc. v. Nippon Densan Corp.,* 49 F.3d 1535 (Fed. Cir. 1995)  . . . . . . . . . . . . 15

*Comark Communs. v. Harris Corp.,* 156 F.3d 1182 (Fed. Cir. 1998)  . . . . . . . . . . . . . . . . . . . 13

*Davis & Cox v. Summa Corp.,* 751 F.2d 1507 (9th Cir. 1985)  . . . . . . . . . . . . . . . . . . . . . . . . 16

*Del Mar Avionics, Inv. v. Quinton Instrument Co.,*
      836 F.2d 1320 (Fed. Cir. 1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Epic Metals Corp. v. H.H. Robertson Co.,* 870 F.2d 1576 (Fed. Cir. 1989)  . . . . . . . . . . . . . . 11

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
      535 U.S. 722 (2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Foster v. Hallco Mfg. Co.,* 1997 U.S. App. LEXIS 18989 (Fed. Cir. 1997)  . . . . . . . . . . . . . . 13

*Graham v. John Deere,* 383 U.S. 1 (1965)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Helfand v. Gerson,* 105 F.3d 530 (9th Cir. 1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Freeman,* 30 F.3d 1459 (Fed. Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384 (Fed. Cir. 1992)  . . . . . . . . . . . . . . . . . . 10

*Johnson & Johnston Assocs. Inc., v. R.E. Serv. Co.,*
      285 F.3d 1046 (Fed. Cir. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120

R.E. SERVICE CO., INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF          C-03-2549 SBA

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . 10, 11

*Masco Corp. v. United States,* 303 F.3d 1316 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Montana v. United States,* 440 U.S. 147 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17

*Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566 (Fed. Cir. 1983) . . . . . . . . . . 14

*Omega Eng'g. Inc. v. Raytek Corp.,* 334 F.3d 1314 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . 26

*Pool Water Prods. v. Olin Corp.,* 258 F.3d 1024 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 12, 13

*Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597 (9th Cir. 1996). . . . . . . . . . . . . . 19

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . 10, 11, 29

*Wang Labs, Inc. v. Applied Computer Sciences, Inc.,* 958 F.2d 355 (Fed. Cir. 1992) . . . . . . . . 19

*Warner-Jenkinson Co., v. Hilton Davis Chem. Co.,* 520 U.S. 17 (1997) . . . . . . . . . . . . . . . . . . 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Robinson & Wood, Inc.
227 North First Street
San Jose, CA 95113
(408) 298-7120