IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NIKKO MATERIALS USA, INC. d/b/a GOULD ELECTRONICS, INC., an Arizona Corporation,<br><br>           Plaintiffs,<br><br>    v.<br><br>R.E. SERVICE CO., INC., a California corporation,<br><br>           Defendant. | No. C 03-2549 SBA<br><br>**ORDER**<br><br>[Docket No. 457] |

This matter comes before the Court on Plaintiff Nikko Materials USA, Inc.'s ("Plaintiff" or "NIKKO") Motion for an Exceptional Case and Attorney's Fees [Docket No. 457]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS NIKKO's Motion for an Exceptional Case and Attorney's Fees [Docket No. 457].

**BACKGROUND**

Plaintiff NIKKO is a New Hampshire corporation that designs, develops, manufactures, and sells products for use in the printed circuit board industry. NIKKO has obtained numerous patents in the United States and abroad relating to the manufacture and design of printed circuit boards.

Johnson & Johnston Associates, Inc. ("JJA") and Defendant R.E. Service Co., Inc. ("RES") have

engaged in protracted litigation over three patent infringement actions. The first action between the parties commenced on October 6, 1992, when RES sued JJA for a declaratory judgment alleging that JJA's U.S. Patent No. 5,153,050 ("the '050 Patent") was invalid, unenforceable and not infringed. JJA counterclaimed that RES was willfully infringing the '050 Patent through the manufacture and sale of its AC3 and AC2 products. In June 1994, a jury found that the '050 Patent was valid and that RES had indeed infringed it. Accordingly, on July 26, 1994, the Court entered a final judgment that the '050 Patent was not invalid and that it was infringed by RES' AC3 and AC2 products.

In late 1996, RES began to sell its SC2 and SC3 products. As a result, on January 21, 1997, JJA initiated a second infringement action against RES alleging that RES' SC2 and SC3 products infringed the '050 Patent. Meanwhile, JJA was issued U.S. Patent No. 5,674,596 ("the '596 Patent")[1] on October 7, 1997.

On October 9, 1998, RES was prevented from producing and selling its SC2 and SC3 products when the Court issued an injunction following the second trial. During the next three-and a-half years, between October 1998 and March 2002, RES ceased to produce and sell its SC2 and SC3 products in compliance with the injunction.

On March 28, 2002, however, the Federal Circuit overturned the judgment in the second litigation and RES subsequently resumed production and sales of its SC2 and SC3 products.

On May 29, 2003, JJA commenced a third action against RES, seeking relief for willful infringement of U.S. Patent Nos. 5,674,596 (the "'596 Patent") and 5,942,315 (the "'315 Patent"), both now owned by NIKKO.[2] The patents are directed to a laminate (copper foil/metal substrate and copper foil/steel substrate) used in making printed circuit boards ("PCB") that greatly decreases the number of defects and rejects in the PCB manufacturing process. In the complaint, NIKKO requested an award of actual damages, an enhancement of damages pursuant to 35 U.S.C. § 284 due to RES' willful infringement, an award of attorney's fees under 35 U.S.C. § 285, and a permanent injunction against

---

[1] The '050 Patent is parent to the '596 Patent.

[2] The remainder of this Order will refer to the Plaintiff exclusively as "NIKKO."

RES' continued sales.

RES' Answer asserted twenty-five distinct affirmative defenses against NIKKO, including, *inter alia*, the defenses of non-infringement, laches, unenforceability, unclean hands, and invalidity.

On August 11, 2003, RES filed a counterclaim in which it asserted that NIKKO "is now selling, has sold and/or is offering for sale . . . one or more products" that infringe upon the claims of four RES patents, including U.S. Patent Nos. 6,129,998 (the "'998 Patent"), 6,129,990 (the "'990 Patent"), 6,130,000 (the "'000 Patent"), and 6,235,404 (the "'404 Patent").

On September 9, 2003, NIKKO filed its Reply to RES' Counterclaims, raising, among other things, the affirmative defenses of non-infringement, invalidity, and prosecution history estoppel.

On October 1, 2003, the parties exchanged their initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure. *See* Poppe Decl. at Exs. E, F. In its Initial Disclosures, RES identified five categories of documents and tangible things in its possession. *See* Poppe Decl. at Ex. F. With respect to damages, RES stated in its Initial Disclosures that it anticipated seeking damages for lost profits, reasonable royalties, costs of suit, and prejudgment interest, as well as seeking attorney's fees under 35 U.S.C. § 285 and treble damages for willful and wanton acts of infringement as provided by 35 U.S.C. § 284.

On October 30, 2003, the parties exchanged Disclosures of Asserted Claims and Preliminary Infringement Contentions pursuant to Patent Local Rule 3-1. RES' disclosure alleged that an unnamed copper-steel laminate product manufactured by NIKKO infringed claims 1-10 of the '990 Patent, claims 2-4, 7-9, and 12-13 of the '998 Patent, claims 1-9 of the '000 Patent, and claims 1-2 of the '404 Patent. *See* Poppe Decl. at Ex. G. RES' disclosure did not identify a specific accused instrument and did not describe where each element of each asserted claim was allegedly found in that accused instrument. *See id.*

On November 7, 2003, counsel for NIKKO wrote a letter to RES's counsel asking that the deficiencies in RES' disclosures be rectified. *See* Poppe Decl. at Ex. H. On November 14, 2003, counsel for RES wrote a letter to NIKKO's counsel stating that RES did not know the name of NIKKO's

3

accused product or its model number and that "exemplars of the Accused Instrumentality were seen by RES at the Hadco plant in New Hampshire." *See id.* at Ex. I. RES never supplemented its Preliminary Infringement Contentions.

RES subsequently served written discovery requests on NIKKO directed at RES' counterclaim for patent infringement. Specifically, RES served Interrogatory Nos. 14-21, Requests for Documents Nos. 26-41, and Requests to Admit Nos. 1-15 and 18-21. *See id.* at Ex. S. NIKKO duly responded in writing. *Id.* NIKKO also produced approximately 5,500 pages of documents directed at RES' counterclaims.

Although RES also served notices for the depositions of four former employees of NIKKO, RES eventually cancelled the depositions before they took place. *See id.* at Exs. J, K. RES did not, in fact, take a single deposition of any fact witness. Further, RES did not identify any expert-in-chief and did not produce any export report in support of its counterclaims for infringement. Although RES did designate a rebuttal expert, Paul DeFrense, and proferred a rebuttal expert report, RES later withdrew Mr. DuFrense as its rebuttal expert. *See id.* at Ex. L.

On January 5, 2004, NIKKO served its Preliminary Infringement Contentions on RES. *See* Poppe Decl. at Ex. W at 2.

On March 12, 2004, NIKKO first raised its affirmative defense of unenforceability in its Objections and Response to RES' First Set of Interrogatories. *See* Poppe Decl. at Ex. X at No. 15.

On March 17, 2004, NIKKO served the following requests for production of documents and things on RES:

- *Request for Production No. 38*: All documents relating to the alleged infringement by [NIKKO] of one or more claims of the RES patents;

- *Request for Production No. 42*: All documents relating to any of the [NIKKO] Accused Products, including but no limited to any information that provided a basis for RES' decision to charge [NIKKO] with patent infringement; and

- *Request for Production No. 44*: All documents relating to any tests, analyses, studies, experiments, reviews, or other efforts conducted by or on behalf of RES to determine, or which otherwise shows, whether any product, device, technology, or system of [NIKKO] or any third party infringes on any claim of any of the RES patents.

4

*See* Poppe Decl. at Ex. M. RES did not produce any documents in response to these requests.

On April 5, 2004, NIKKO served RES with a Second Set of Requests for Admission. *See id.* at Ex. N. NIKKO asked RES to admit that it had not tested the metal substrate sheet in any of the accused NIKKO products for hardness, surface finish, or coefficient of thermal expansion. *See id.* at Ex. N. at Nos. 43, 44, 45. On May 5, 2004, RES denied each of NIKKO's requests, thereby indicating that the accused products had been so tested. *See* Poppe Decl. at Ex. O at Nos. 43, 44, and 45. Yet, RES did not produce any documents reflecting that any such tests were performed on the NIKKO accused products.

Moreover, in a Second Set of Interrogatories also served on April 5, 2004, NIKKO asked that "[f]or each of the RES patents, [RES] describe any investigation made by or an behalf of RES prior to filing of its counterclaims in this action regarding whether the claim is infringed by [NIKKO] . . . . " *See* Poppe Decl. at Ex. P at No. 25. On June 11, 2004, RES responded:

> In late 2001, when visiting Hadco Corp., Derry, NH, Mark Frater viewed [the] product that infringes the RES patents. Mr. Frater asked for and received permission from Ann Parkhearst, the purchasing manager, to handle, examine, and take apart a sample of the material marked JJA CSC. Upon close visual and tactile examination, Mr. Frater was able to determine that the product in question infringed upon the RES patents.

*See* Poppe Decl. at Ex. Q at No. 25.

However, at his deposition, RES' 30(b)(6) designee, Mark Frater, the President, Chief Executive Officer, and sole owner of RES, testified that his only familiarity with the accused NIKKO product was from "grabbing," "holding up," and "looking at" a single sample of CSC in late 2001 and "mov[ing] it like this a little bit." *See* Poppe Decl. at Ex. R at 6:12-7:8, 70:24-71:21. Mr. Frater admitted that he did not know the hardness, surface finish, or coefficient of thermal expansion of the steel in the accused NIKKO products, and had made no attempt to measure those properties. *Id.* at Ex. R at 72:19-75:7. He also testified that he "didn't particularly pay much attention to the adhesive" and did not "know how it was applied." *Id.* at Ex. R at 72:11-14, 73:2-5. Subsequently, in response to written discovery requests, RES made clear that it would rely *solely* on Mr. Frater's testimony to show infringement. *See* Poppe Decl. at Ex. T at 25.

5

In his deposition, Mr. Frater also testified that information disclosed in an Information Disclosure Statement ("IDS") submitted to the United States Patent and Trademark Office ("PTO") during prosecution of the '990, '998, '000, and '404 Patents was false due to the fact that surface finish of stainless steel and carbon steel substrates of the SC2 and SC3 products sold before April 10, 1997 was less than 17 RMS instead of greater than 17 RMS as disclosed in the IDS. *See* Poppe Decl. at Ex. BB at 113:29-116:2, 183:23-186:15. Moreover, Mr. Frater also admitted that he failed to disclose that some of the SC2 and SC3 products sold before April 10, 1997 used a stainless steel substrate having a surface finish of 8 RMS. *Id.* Additionally, Mr. Frater's testimony revealed that RES had no documents or information that indicated what types of steel substrates were used in the SC2 and SC3 products sold before April 10, 1997. *See* Poppe Decl. at Ex. R at 66:17-68:19; Ex. BB at 175:8-179:17. Subsequently, NIKKO served deposition subpoenas on several RES steel suppliers identified by Mr. Frater in his deposition in order to determine the precise metallurgical characteristics of the steel substrate used by RES in its SC2 and SC3 products sold more than one year prior to the applicable filing date of the patents, April 10, 1997. *See* Poppe Decl. at Ex. Y.

NIKKO thereafter filed an Amended Reply to include the additional affirmative defense, and corresponding counterclaim, of unenforceability. NIKKO also served RES with Final Invalidity Contentions to disclose additional prior art defenses uncovered during discovery. *See id.* at Ex. Z. Further, NIKKO served a supplemental set of interrogatory responses on RES to reflect this new information. *See* Poppe Decl. at Ex. AA.

Additionally, during the discovery phase, NIKKO retained a technical expert, Gregg Frazier, and a patent law expert, Thomas Smegal, to assist with the defense of RES' counterclaims. *See* Poppe Decl. at Ex. EE. NIKKO also deposed other RES witnesses, including John O'Bannion and Michael Mantelle.

The parties also exchanged sales information on their respective accused products, and reached an agreement that damages would be calculated as a reasonable royalty of 7.5% of sales. *See* Isackson Decl. at ¶ 10. Thus, based on this information, RES was aware, or should have been aware, that its

6

infringement claim was worth no more than $8,565.23, excluding prejudgment interest and any enhanced damages. *Id.* RES also was on notice of the fact that no samples of NIKKO's accused CSC products manufactured in the United States still existed, that NIKKO had ceased manufacturing its CSC products in the United States in 2002, and that NIKKO had no plans to begin manufacturing a steel substrate laminate in the United States in the foreseeable future. *See* Poppe Decl. at ¶ 2.

In October 2004, NIKKO forwarded a two-part settlement proposal to RES. *See* Isackson Decl. at Ex. C. Part I addressed resolving only the RES patent dispute and Part II addressed the entire case. *Id.* In Part I, NIKKO offered to give RES a credit of $8,565.23, the stipulated amount of damages RES would have been entitled to based on NIKKO's sales of its accused CSC product, to be applied to any amount RES would be required to pay NIKKO in resolution of NIKKO's patent claims. *See id.* NIKKO also offered not to manufacture or sell in the United States for five years any copper-steel laminates containing steel with the metallurgical properties required by the RES patent claims. *Id.* In exchange, RES was asked to agree to: (1) dismiss with prejudice its counterclaims against NIKKO, and (2) not bring a claim for patent infringement of any of the four patents for five years. *Id.* RES rejected the offer.

On January 7, 2005, NIKKO filed three motions for summary judgment. In those motions, NIKKO argued: (1) that certain asserted claims of the '315 Patent and '596 Patent were infringed and not invalid; (2) that RES' defenses of inequitable conduct and unclean hands were without merit; and (3) that the accused NIKKO products did not infringe any of the asserted RES patents. RES filed one motion for summary judgment by which it sought a ruling that its SC3 products did not infringe the asserted claims of NIKKO's patents.

On February 4, 2005, the Court granted summary judgment to NIKKO on RES' invalidity, inequitable conduct, and unclean hands defenses. The Court also granted summary judgment in NIKKO's favor on RES' defenses of inequitable conduct and unclean hands.

After the Court granted RES' request for a Rule 56(f) continuance on the third of NIKKO's motions for summary judgment, the Court granted summary judgment in NIKKO's favor on the issue

7

of non-infringement of the '990, '998, '000, and '404 Patents. The Court expressly found that RES had presented *no* tangible evidence to support its allegations of infringement.

A jury trial was held from March 28, 2005 to April 11, 2005 on NIKKO's claim that RES was willfully infringing upon claims 12,13, and 14 of the '596 patent by making, using or selling the SC2 and SC3 products. Trial was also held on RES' affirmative defense of laches.

On April 8, 2005, RES moved to dismiss NIKKO's counterclaim for unenforceability on the grounds that the Court's dismissal of RES' own infringement counterclaims rendered NIKKO's counterclaim moot. The Court granted RES' motion.

On April 11, 2005, a unanimous jury found that RES made, used, offered to sell, and sold SC2 and SC3 products that infringed NIKKO's '596 Patent, and that RES' infringement was willful. Acting in an advisory capacity only, the jury also found that RES had failed to show by a preponderance of the evidence that NIKKO unreasonably delayed in filing suit for infringement of the '596 Patent.

Following trial, NIKKO filed the instant Motion for an Exceptional Case and Attorney's Fees.

## **LEGAL STANDARD**

Section 285 of the Patent Act provides that "[t]he court in exceptional circumstances may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The purpose of 35 U.S.C. § 285 is to provide discretion where it would be unjust that the prevailing party be left to bear the burden of its own counsel fees. *J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1051-52 (Fed. Cir. 1987). The determination of whether a case is an "exceptional" one within the meaning of 35 U.S.C. § 285 is left solely for the trial judge. *Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994). The purpose of 35 U.S.C. § 285 is to compensate the prevailing party for its monetary outlays in the prosecution or defense of a patent suit. *Central Soya Co. v. Geo A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). The Federal Circuit has interpreted 35 U.S.C. § 285 as including not only the recovery of attorney fees, but also the recovery of all reasonable expenses incurred in prosecuting the entire action. *Id.* Thus, upon finding a case exceptional, an award of all reasonable and necessary expenses related to the litigation is properly within the scope of 35 U.S.C. § 285. *Id.* (affirming award of

8

expenses). Such fees include all expenses that are not covered by the attorneys' hourly rates, routinely paid by counsel and billed to the client, and that are not expenses incurred for the convenience of counsel. *See, e.g., Bennett v. Department of Navy*, 699 F.2d 1140, 1145 (Fed. Cir. 1983). These expenses may include costs ordinarily not recoverable under 28 U.S.C. § 1920 and Rule 54(d) of the Federal Rules of Civil Procedure, fees associated with non-attorneys such as paralegals, law clerks, and secretaries, and lodging expenses of counsel and witnesses. *Mathis v. Spears*, 857 F.2d 749, 757-59 (Fed. Cir.1988).

The determination of an appropriate attorney fee award requires a three-step inquiry: (1) whether there is clear and convincing evidence that the case is exceptional; (2) if so, whether an award of attorney fees is warranted; and (3) whether the attorney fees sought are reasonable in amount. *Interspiro*, 18 F.3d at 933; *Machinery Corp. of Amer. v. Gullfiber AB*, 774 F.2d 467, 470 (Fed. Cir. 1985). As to the first step, a finding of willful infringement is sufficient to justify classifying a matter as an "exceptional case," thereby granting the trial court discretion to award attorney fees. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1329 (Fed. Cir. 1987). Indeed, "[d]istrict courts have tended to award attorney fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 200 (Fed.Cir.1986) (citations omitted).

Absent a finding of willful infringement, a finding of bad faith, litigation misconduct, or unprofessional behavior also may suffice to make a case exceptional. *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996) (collecting cases). The Federal Circuit has noted that bad faith can include "attorney or client misconduct during litigation, or unnecessarily prolonging litigation." *Jurgens v. CBK*, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996). Moreover, "where one continues his infringing activity, and fails to investigate and determine, in good faith, that he possesses reasonable defenses to an accusation of patent infringement, the infringement is in bad faith." *Jurgens*, 80 F.3d at 1571. It is also bad faith when an infringer "merely copies a patented invention, or where he obtains incompetent, conclusory opinions of counsel only to use as a shield against a later charge of willful

9

1 infringement, rather than in a good faith attempt to avoid infringing another's patent." *Jurgens*, 80 F.3d
2 at 1571.

3 Finally, 35 U.S.C. § 285 limits the award of attorney fees to those fees that are reasonable. 35
4 U.S.C. § 285. A determination of reasonableness must be evidenced by the billing rate charged and the
5 number of hours expended. *Lam, Inc. v. Johns-Mansville Corp.*, 718 F.2d 1056, 1068-69 (Fed. Cir.
6 1983). In *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951
7 (1976), the Ninth Circuit identified twelve factors for determining the reasonableness of attorney fees
8 and costs requested by a litigant. The twelve *Kerr* factors are: (1) the time and labor required, (2) the
9 novelty and difficulty of the questions involved, (3) the skill required to perform the legal service
10 properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the
11 customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or
12 the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and
13 ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the
14 professional relationship with the client, and (12) awards in similar cases. *Kerr*, 526 F.2d at 70. In
15 determining an appropriate award of attorney fees and costs, a court need not always analyze each of
16 the foregoing factors. *McGinnis v. Kentucky Fried Chicken*, 42 F.3d 1273, 1277 (9th Cir.1994). Indeed,
17 many of the factors may address matters irrelevant in a particular case or issues about which very little
18 needs to be said. *Id.*

### **ANALYSIS**

**A.    Whether Case is Exceptional**

In its Motion for Exceptional Case and Attorney's Fees, NIKKO argues that the Court should find this case exceptional due to the fact that: (1) RES was found to have willfully infringed NIKKO's '596 Patent; (2) RES was found to have willfully infringed NIKKO's patents in two prior cases; (3) RES failed to conduct an adequate pre-suit investigation of its infringement counterclaims and litigated its frivolous infringement counterclaims against NIKKO in bad faith; and (4) RES asserted numerous

affirmative defenses in a vexatious manner.[3]

In response, RES concedes that it was found to have willfully infringed NIKKO's patents in this case, as well as in the two previous cases between the parties. RES argues, however, that a finding of willful infringement does not "mandate" an exceptional case finding. RES further argues that the other reasons NIKKO offers in support of its exceptional case motion are unsupported by the facts. Namely, RES argues that: (1) this was a "simple case that was litigated with the utmost professionalism;" (2) RES' pre-filing investigation was "reasonable under the circumstances;" (3) RES pursued its counterclaims against NIKKO in good faith; and (4) RES asserted its affirmative defenses in good faith and in a reasonable manner.

The Court finds RES' arguments to be unpersuasive. First, as to the finding of willful infringement, Federal Circuit law "uniformly indicate[s] that the willfulness of the infringement by the accused infringer may be a sufficient basis in a particular case for finding the case 'exceptional' for the purposes of awarding attorneys fees." *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir. 2004). Indeed, even the cases cited by RES support this proposition. *See, e.g., Rohm & Haas Co. v. Crystal Chem. Co.*, 736 F.3d 688, 691 (Fed. Cir. 1984) ("[c]ases awarding attorney fees to prevailing patentees have typically found 'exceptional' circumstances in willful and deliberate infringement by an infringer, *or* in the prolongation of litigation in bad faith.") (emphasis added). Further, as noted separately in this Court's Order granting NIKKO's Motion for Enhanced Damages, in this particular case, the question of willful infringement was *not* a close question.

Additionally, NIKKO has effectively shown that RES engaged in numerous bad faith litigation tactics. For example, it is clear from the history of the case, and from certain admissions made by RES and its president, Mr. Frater, that RES pursued its infringement counterclaims until the eve of trial even

---

[3]NIKKO also argues that RES inequitable conduct before the PTO warrants a finding that this case is exceptional. However, as both parties concede, following the dismissal of RES' infringement claims from the lawsuit, the Court determined that it did not have jurisdiction to determine whether RES' patents were unenforceable due to inequitable conduct. Since the Court has determined that it lacks jurisdiction to consider this issue, evidence pertaining to NIKKO's unenforceability counterclaim will not be considered on this Motion.

11

1  though it had no reasonable basis to do so. Indeed, it is undisputed that RES did not obtain a sample
2  of NIKKO's accused product prior to filing its counterclaims. In fact, Mr. Frater admitted in his
3  deposition that his only familiarity with the accused NIKKO product was from "grabbing," "holding
4  up," and "looking at" a single sample of CSC in late 2001 and "mov[ing] it like this a little bit." *See*
5  Poppe Decl. at Ex. R at 6:12-7:8, 70:24-71:21. Mr. Frater further admitted that this "inspection" did not
6  provide him with any knowledge regarding the hardness, surface finish, or coefficient of thermal
7  expansion of the steel in the accused NIKKO products. *Id.* at Ex. R at 72:19-75:7. Since these
8  properties were critical elements of RES' patent claims, without such knowledge, it is clear that RES
9  had no basis to initiate an infringement suit. Perhaps more egregious, however, is the fact that RES
10 learned, in March 2004, that no samples of NIKKO's accused CSC products manufactured in the United
11 States still existed, that NIKKO had ceased manufacturing its CSC products in the United States in
12 2002, and that NIKKO had no plans to begin manufacturing a steel substrate laminate in the United
13 States in the foreseeable future. *See* Poppe Decl. at ¶ 2.[4] Yet, despite the overwhelming lack of any
14 competent evidence in support of its claims, RES never conceded the baselessness of its claims, and due
15 to its request for a continuance, postponed the resolution of this issue until the Pretrial Conference, one
16 week before trial was set to commence. Further, contrary to RES' current belief, the Court's ruling on
17 the summary judgment was *expressly* premised on the fact that RES was utterly unable to produce *any*
18 evidence in support of its infringement claims.

19 Similarly, NIKKO was forced to defend against RES' affirmative defenses of inequitable conduct
20 and unclean hands, two defenses that the Court ultimately found to be wholly unsupported by any facts.
21 *See* Jan. 17, 2005 Order (noting that RES "failed to introduce any evidence from which a trier of fact
22 could find inequitable conduct."). Additionally, RES admitted, during its summary judgment briefing,
23 that it had *no* evidence to support any of its invalidity defenses other than the defense of anticipation.
24 Twenty other affirmative defenses asserted by RES were eventually abandoned or withdrawn. The two

25
26  [4]RES also learned, based on the sales information NIKKO provided to it, that its infringement
27  counterclaim was worth no more than $8,565.23, excluding prejudgment interest and any enhanced
    damages. *See* Isackson Decl. at ¶ 10.
28
                                                    12

1  defenses that RES did fully litigate – anticipation and laches – were also found to be lacking in merit
2  by this Court. Indeed, when RES' conduct is considered in the cumulative, coupled with the fact that
3  RES has been found to have willfully infringed NIKKO's patents during three separate lawsuits, the
4  scales are tipped very heavily in favor of an exceptional case finding. Accordingly, the Court GRANTS
5  NIKKO's request to have this case declared exceptional.

**B.     Reasonableness of Requested Attorney's Fees**

NIKKO next asks the Court to award it attorney's fees and expenses in the amount of $3,408,818.40 ($3,063,396.10 in fees, $345,426.71 in costs).[5] In support of its request, NIKKO has presented the Court with a declaration of counsel setting forth NIKKO's counsel's itemized billing statements. *See* Isackson Decl. at ¶ 5, Ex. A. NIKKO has also supplied the Court with declarations from its Chief Financial Officer and Vice President, both of whom state that they have reviewed the billing records submitted by NIKKO's counsel and consider the fee request to be reasonable. *See* Rich Decl. at ¶¶ 3-5; Burgess Decl. at ¶ 3. Further, NIKKO's counsel avers that it has endeavored to include only those items that are recoverable. Additionally, NIKKO has submitted an AIPILA survey, which NIKKO contends supports a finding that the median fees and costs incurred in a patent trial is $1.5 million. While NIKKO concedes that its requested fees are in excess of $1.5 million, it notes that this particular case actually involved *two* separate patent actions (one initiated by NIKKO and one initiated by RES) that involved a total of six patents and 37 asserted claims. Accordingly, NIKKO requests that the Court find its request for attorneys fees reasonable.

RES, on the other hand, argues that NIKKO's requested fees are unreasonable and "bear[] no relationship to the litigation." In support of its argument, RES contends that this litigation "was not particularly complex or time-consuming compared to most patent cases" and that the issues "presented by the case were limited . . . [and] were limited even further by the time of trial." In light of the fact that

---

[5] In its opening brief, NIKKO requested fees in the amount of $2,812,597.50. However, it reserved the right to supplement its proof as to the amount of fees with invoices from its counsel for work performed in April 2005, and any retained experts' and third party service providers' invoices for work related to trial. This supplemental evidence was filed at the same time as NIKKO's reply brief.

13

this case dragged on for nearly three years, due largely in part to RES' pursuit of its own frivolous counterclaims and affirmative defenses, the Court finds this characterization of the litigation disingenuous. Indeed, while the trial itself was relatively brief, many of the issues for trial were eliminated through summary judgment motions only a month before trial. The remaining issues were resolved only a week before trial was scheduled to commence.

RES's argument that NIKKO's fees should be substantially reduced by this Court is also unpersuasive. In its Opposition, RES presents three alternative bases for calculating the appropriate award of attorney's fees. None of these alternatives is a tenable basis for reducing NIKKO's requested fee award.

RES's first argument is that NIKKO should be limited to recovering only those fees and costs incurred in the handling of "the matters of which NIKKO complains – RES' counterclaim, RES' patents, and RES affirmative defenses." RES asserts that this calculation would result in fees in the amount of only $107,870 and costs in the amount of $17,783.32. *See* Nakamae Decl. at Ex. I. This "alternative" method of calculating fees and costs, however, is completely illogical. For instance, although the method awards NIKKO the fees and costs it expended on RES' claims, it fails to provide NIKKO with *any* compensation for prevailing on the heart of its own dispute with RES: the willful infringement of NIKKO's patent. RES offers no explanation as to why NIKKO should be penalized in such a manner and provides no authority in support of such a stunningly inequitable approach. As such, the Court rejects this first alternative basis for awarding fees and costs.

In RES's second suggested alternative, RES argues that NIKKO's total fees should be reduced by 25% because NIKKO had "an unnecessary number of attorneys working on the same matter" and another 10% because NIKKO's counsel was located in three different cities. RES further argues that NIKKO should not be compensated for work performed on the following matters: (1) 65.3 hours that NIKKO billed for researching a preliminary injunction motion that was not filed; (2) 349.0 hours of attorney time and 15.75 hours of paralegal time that NIKKO billed for work performed on its invalidity counterclaim; (3) 9.0 hours that NIKKO billed for researching a doctrine of equivalents theory that it

14

did not present at trial; and (4) 231.5 hours for "unidentified activities." RES then argues that the Court should allocate the fees between the following three actions: (1) NIKKO's patent infringement claims; (2) RES' counterclaims; and (3) NIKKO's counterclaims. RES submits that a reasonable allocation of the fees is: (1) 60% for work performed on NIKKO's patent infringement claims; (2) 20% for work performed on RES' counterclaims; and (3) 20% for work performed on NIKKO's counterclaims. After the fees are allocated, RES argues that the 60% allocation should be further reduced by 75% to account for NIKKO's dismissal of some of its patent claims on the eve of trial and that the 20% allocated to NIKKO's counterclaims should not be awarded at all.[6] Additionally, RES argues that all of NIKKO's attorneys should be compensated at an average attorney rate of $200 per hour and a paralegal rate of $80 per hour. According to RES' calculations, the second alternative results in a total award of fees in the amount of $227,600 and costs in the amount of $43,508.52.

As NIKKO aptly points out, RES' attack on the number of hours billed by NIKKO's counsel is based on RES' own speculation and conjecture and is wholly unsupported by any competent evidence. For example, although RES contends that an "excessive" amount of attorneys worked on the case, a review of NIKKO's billing statements reveals that the attorneys working on the case performed discrete tasks. There is no indication of any undue duplication of labor. Further, although the case was staffed in part with attorneys residing outside of California, there is no evidence that NIKKO's counsel billed for time spent traveling and not working. *See* Isackson Supp. Decl. at ¶ 2. Additionally, with respect to the work performed on the preliminary injunction and the invalidity counterclaims, NIKKO has persuasively shown that the work performed was a necessary and reasonable part of both NIKKO's affirmative case and its defense. *Accord Allen v. Bay Area Rapid Transit*, 2003 U.S. Dist. *LEXIS* 24917, *20 (N.D. Cal. 2003) ("An unsuccessful motion is not an unsuccessful claim. Under the rule proposed by defendants, a plaintiff who prevailed at trial would be entitled to recover the costs of trying certain claims, but not, *e.g.*, the costs of filing and arguing an unsuccessful motion for summary judgment on

---

[6]RES, concedes, however, that NIKKO is entitled to the 20% of its fees allocated to defending against RES' counterclaims.

those claims. Such a rule would undermine the purpose for which federal fee-shifting provisions were enacted[.]"). Moreover, with respect to RES' allegation that some of NIKKO's time entries pertain to "unidentified activities," having reviewed the same records, the Court finds that the billing statements are sufficiently clear. NIKKO has effectively shown that these time entries relate to NIKKO's efforts to review the records from the prior litigations.

The Court also finds that RES' proposed fee allocations and related reductions are unwarranted. RES has not provided the Court with *any* relevant authorities in support of its proposed reductions, which – in sum – have the total effect of reducing NIKKO's requested fees from roughly $3 million to $200,000. Additionally, the Court rejects RES' argument that NIKKO's attorneys should be compensated at a blended hourly rate of $200. Due to the highly technical nature of this case, which required NIKKO to obtain counsel with expertise beyond that of the average member of the bar, the Court finds that the rates charged by NIKKO's counsel are reasonable and appropriate.

Finally, the Court finds that RES' third proposed alternative, that NIKKO should be denied all of its requested fees and costs, is completely unsubstantiated and unwarranted.

As a result, the Court finds that, given the length of the underlying proceedings, and the complexity and number of the issues involved, NIKKO has shown that an award of fees and costs in the amount of $3,408,818.40 is reasonable. NIKKO's Motion is therefore GRANTED in its entirety.

## **CONCLUSION**

IT IS HEREBY ORDERED THAT NIKKO's Motion for Exceptional Case and Attorney's Fees is GRANTED [Docket No. 457]. NIKKO is hereby awarded attorney's fees in the amount of $3,063,396.10 and costs in the amount of $345,426.71.

IT IS SO ORDERED.

Dated: 1/12/06

SAUNDRA BROWN ARMSTRONG
United States District Judge

16